**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.  5:08CR250** |
| | ) | |
| Plaintiff, | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| v. | ) | |
| | ) | |
| **TOMMY A. GONZALES,** | ) | |
| **MALCOLM A. SALES,** | ) | |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

This matter is before the Court upon Motions to Suppress Evidence filed by Defendants Malcolm A. Sales and Tommy A. Gonzales ("Defendants"). (Dkt. # 14, 18).

**I. PROCEDURAL BACKGROUND**

The Government filed the Indictment in the instant matter on June 3, 2008. (Dkt. # 9). Both Defendants were charged with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; possession with intent to distribute approximately 30 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A); and interstate travel to promote unlawful activity, in violation of 18 U.S. § 1952 of the United States Code. (Dkt. # 9).  Each Defendant entered a plea of not guilty to each count on June 11, 2008.

1

Defendant Malcolm A. Sales ("Sales") filed a Motion to Suppress Evidence on July 15, 2008. (Dkt. # 14). Defendant Tommy A. Gonzales ("Gonzales") filed a Motion to Suppress Evidence on July 21, 2008. (Dkt. # 18). The Government filed a response to both Motions on August 1, 2008. (Dkt. # 25). A hearing was held on August 7, 2008 ("Suppression Hearing").

## II. FACTUAL BACKGROUND

Defendants challenge the validity of an airplane stop and subsequent search under the Fourth Amendment to the United States Constitution. The search occurred on May 2, 2008, at the Kent State University Airport ("KSU Airport") in Stow, Ohio.

### A. Testimony of Special Agent Kenneth Martinson

Agent Kenneth Martinson ("Agent Martinson") testified that he is a Special Agent with the Bureau of Immigration and Customs Enforcement ("BICE"). (Transcript of the Suppression Hearing ["Tr."] at 3). Agent Martinson is assigned to the BICE human smuggling unit and is tasked with the interdiction and prevention of human smuggling at Los Angeles, California, area airports. (Tr. at 4).

According to his testimony, Agent Martinson began a smuggling investigation in September of 2007 involving aircraft in and around the Compton Woodley Airport in the City of Compton, Los Angeles, California. (Tr. at 5). Agent Martinson described the Compton Woodley Airport as small airport with no control tower that has a history of smuggling events. (Tr. at 5-6).

Agent Martinson testified that he began to focus his investigation on one particular suspicious plane at Compton Woodley Airport. (Tr. at 7). The plane was referred to throughout the hearing by its aviation license number: N668LB ("Airplane N668LB"). During the course of his investigation, Agent Martinson learned that Airplane N668LB was controlled by Defendant Malcolm Sales. (Tr. at 8). Agent Martinson also learned that Defendant Sales was the pilot of an aircraft interdicted in 2004 carrying five undocumented immigrants. (Tr. at 8). The interdiction resulted in no charges against Defendant Sales. (Tr. at 9). Agent Martinson subsequently began to monitor Airplane N668LB and requested notification from U.S. Customs and Border Protection Air Marines Operation Center ("AMOC") of any long distance movement of the plane. (Tr. at 9).

Agent Martinson testified that he became aware of what he felt were suspicious flights conducted by Airplane N668LB. The first flight was from Compton Woodley Airport to Lexington, Kentucky Airport on April 12, 2008. (Tr. at 9). Agent Martinson requested that local officials in Lexington conduct a "ramp check" of Airplane N668LB. (Tr. at 9-10). A ramp check essentially requires a pilot to produce certain documents, without cause, as a condition of being granted flight privileges. (Tr. at 10). During the ramp check, Defendant Sales consented to a search of Airplane N668LB. (Tr. at 11). The local authorities did not find any contraband on the plane. (Tr. at 11).

On the same day, Airplane N668LB proceeded to KSU Airport, stayed only one evening, and immediately returned to Compton Woodley Airport the next morning. (Tr. at 12). KSU Airport to Compton Woodley Airport is a sixteen hour direct flight. (Tr. at

3

12).  Special agent Martinson described the KSU Airport as conducive to smuggling events and very similar to Compton Woodley Airport, in that it is small with no control tower and no staff after 8p.m.  (Tr. at 11).  Agent Martinson testified he found this flight to be suspicious because of its high fuel cost and short duration on the ground.  (Tr. at 35).  Agent Martinson pointed out that Airplane N668LB and Malcolm Sales do not possess the appropriate license to fly charter passengers for hire.  (Tr. at 19).

Agent Martinson also described a second suspicious flight in which Airplane N668LB flew from Compton Woodley Airport to Las Vegas, Nevada.  The plane remained on the ground for only a short time and then immediately returned to Compton Woodley Airport.  (Tr. at 13-14).  Agent Martinson requested a ramp check of Airplane N668LB in Las Vegas, but local authorities were unable to respond in time.  (Tr. at 13-14).

Agent Martinson next testified about the flight that gave rise to the Defendants' Motions to Suppress.  Agent Martinson was notified on May 2, 2008, that Airplane N668LB had landed in Olathe, Kansas, and was again bound for KSU Airport.  (Tr. at 41-42).  Agent Martinson also received information from AMOC, which later turned out to be false, that a George Burol might be on the plane.  (Tr. at 16).  Agent Martinson also learned that George Burol had a record of controlled substance trafficking arrests and convictions.  (Tr. at 16, 20).

Agent Martinson then contacted AMOC, who in turn contacted the Kent State University Police ("KSU Police").  (Tr. at 16-17).  Later the same day, Agent Martinson

spoke to Officer Joseph Hendry ("Officer Hendry") of the KSU Police by telephone and communicated his suspicion relating to the movement of Airplane N668LB.  (Tr. at 17). Agent Martinson relayed the possible occupants of the plane, the suspicious past activity associated with the plane, and the suspicious nature of the plane's current flight.  (Tr. at 17).  Agent Martinson also discussed with KSU police the possibility that someone might be waiting to receive contraband at the KSU Airport.  (Tr. at 18-19).  Agent Martinson requested that KSU Police conduct a ramp check and a dog sniff of Airplane N668LB.  (Tr. at 18).  Agent Martinson also asked KSU Police to obtain consent to search the plane or, in the alternative, to "develop probable cause."  (Tr. at 45).

### B. Testimony of Officer Joseph Hendry

Officer Hendry testified that after speaking with Agent Martinson, he helped organize a group of KSU Police, City of Kent, Ohio Police, Stow, Ohio Police, and the Ohio State Highway Patrol ("the officers") to fulfill Agent Martinson's request.  (Tr. at 65-66).  According to Officer Hendry, he initially planned to approach the pilot of Airplane N668LB and conduct a simple ramp check with the help of the Ohio State Highway Patrol.  (Tr. at 67).  Officer Hendry arranged for the Stow Police and the City of Kent canine unit to stand by to assist if they were needed.  (Tr. at 68).

However, Officer Hendry testified that moments before Airplane N668LB arrived at KSU Airport, Stow Police encountered a pickup truck in a parking lot at the airport. (Tr. at 68-69).  The driver of the vehicle was Defendant Robert Hawes, who indicated to the officers that he was waiting for a plane to arrive at the airport.  (Tr. at 70).  The

officers ran a criminal background check, which revealed that Defendant Hawes had an extensive history of arrests and convictions for drug trafficking and carrying concealed weapons.  (Tr. at 70).

According to Officer Hendry, the discovery of Defendant Hawes created an increased risk to the officers approaching the plane.  (Tr. at 74).  In addition, after the plane came to a complete stop and turned off its engine, Officer Hendry testified he heard the plane begin to "rev back up."  (Tr. at 75-76).  Officer Hendry testified that these two factors changed the way the officers executed the stop of Airplane N668LB.  (Tr. at 76).

Instead of conducting a ramp check, Officer Hendry ordered the officers to move in and block the plane.  (Tr. at 76).  According to the testimony, approximately six to eight police cruisers with their sirens on, containing eight to ten officers, surrounded the plane.  (Tr. at 75, 87, 91).  The officers had their weapons drawn.  (Tr. at 91-92)  One of the officers commanded the occupants out of the plane in a loud, yelling voice.  (Tr. at 138).  The Defendants were then handcuffed and each placed in a cruiser for questioning. (Tr. at 93).  Video presented at the Suppression Hearing showed that within seconds, a canine unit was deployed and gave a positive sniff.  The officers subsequently searched the plane and found approximately 30 kilos of cocaine.  (Tr. at 20).

## III. LAW AND ANALYSIS

Defendants set forth three reasons why the Government's evidence should be suppressed.  First, Defendants contend that the officers at the KSU Airport did not have reasonable suspicion to conduct an investigatory stop of Airplane N668LB.  Second,

Defendants contend that the officers' actions amounted to an arrest without probable cause. Third, Defendants contend that the dog sniff of Airplane N668LB was unlawful. For the reasons that follow, the Court rejects all three of Defendants' arguments.

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. Warrantless searches and seizures are per se unreasonable, subject to a limited number of exceptions. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); Minnesota v. Dickerson, 508 U.S. 366, 372 (1993). One such exception exists, however, for "investigatory stops." A law enforcement officer may make a brief investigatory stop of an individual so long as there is a reasonable basis for doing so. Terry v. Ohio, 392 U.S. 1, 22-24 (1968).

Police officers have the authority to make a "Terry stop" and temporarily detain citizens if the officers have a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30). The reasonableness of a Terry stop is determined by examining "(1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand." U.S. v. Hardnett, 804 F.2d 353, 356 (6th Cir. 1986).

**A. The officers had reasonable suspicion to conduct an investigatory stop.**

The Court must first determine whether the officers reasonably suspected that Defendants might be engaged in criminal activity at the KSU Airport. The reasonableness of an officer's suspicion is based on the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Erwin, 155 F. 3d 818, 822 (6th Cir. 1998). Courts must review the alleged suspicious actions, not independent of one another, but as a whole. United States v. Cortez, 449 U.S. 411, 417 (1981); Sokolow, 490 U.S. at 9; United States v. Orsolini, 300 F.3d 724, 728-29 (6th Cir. 2002).

Moreover, in formulating their own reasonable suspicion, officers can rely on information received from other officers. Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008). An officer's reasonable suspicion to conduct an investigatory stop may therefore result from sources other than their own observations, such as "informant tips, dispatch information, and directions from other officers." Id., at 395-396; see also United States v. Hensley, 469 U.S. 221, 231-32 (1985).

In the instant case, the totality of the circumstances demonstrates that the officers had at least a reasonable suspicion that criminal activity might be afoot at the Kent State University Airport on May 2, 2008. Agent Martinson began investigating Airplane N668LB and Defendant Sales when he learned Defendant Sales had been interdicted carrying five undocumented immigrants in 2004. Agent Martinson then monitored Airplane N668LB and found the plane's flights to Lexington, Kentucky, and Las Vegas, Nevada suspicious because of the short time the plane spent on the ground in contrast to

the length and high cost of such a trip. Airplane N668LB and Defendant Sales, moreover, were not licensed to fly and drop off passengers for hire.

Agent Martinson relayed all of his suspicions relating to Airplane N668LB and Defendant Sales to Officer Hendry of the KSU Police. Agent Martinson also informed Officer Hendry that George Burol, whose background contained drug convictions and arrests, might be on the plane. Officer Hendry and other officers at the KSU airport relied on this information to form their own suspicions. The officers' suspicions were heightened further when they encountered Defendant Hawes, who also had multiple drugs and weapons charges, waiting to meet the plane at the airport.

The officers, particularly Officer Hendry, were therefore aware of specific articulable facts that criminal activity might be afoot at the KSU Airport. The circumstances, taken as a whole, establish that the officers had reasonable suspicion to conduct an investigatory stop of Airplane N668LB.

**B. The officers' conduct did not amount to an arrest.**

The Court must next determine whether the officers' intrusion into the Defendants' personal security was reasonably related in scope to the situation at the KSU Airport. Defendants contend that the officers' actions went beyond a mere investigatory stop and constituted a "full-blown arrest." (Dkt. # 14 at 4) (citing U.S. v. Wiggins, 828 F.3d 1199, 1200 [6th Cir. 1987]).

Even when an officer has reasonable suspicion to detain a person or his possession for investigation, an officer's investigatory detention can "mature" into an illegal arrest or

seizure if it occurs "over an unreasonable period of time or under unreasonable circumstances." United States v. Avery, 137 F.3d 343, 349 (6th Cir. 1987). The Court must therefore examine the reasonableness of the officers' conduct "given their suspicions and the surrounding circumstances." United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993).

For a Terry stop to be lawful, officers must have "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant..." United States v. Sharpe, 470 U.S. 675, 686 (1985); see also Florida v. Royer, 460 U.S. 491, 500 (1983); United States v. Orsolini, 300 F.3d 724, 730 (6th Cir. 2002). There is, however, "no rigid time limitation on the lawfulness of a Terry stop." United States v. Winfrey, 915 F.2d 212, 217 (6th Cir. 1990) (citing Sharpe, 470 U.S. at 687-686).

Furthermore, "the mere use or display of force in making a stop will not necessarily convert a stop into an arrest." Hardnett, 804 F.2d at 357. Handcuffing and placing an individual into a cruiser does not automatically constitute an arrest. Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1987).

A reviewing court must therefore determine whether "the surrounding circumstances give rise to a justifiable fear for personal safety." Hardnett, 804 F.2d at 357. Courts have generally upheld law enforcement actions taken during investigatory stops, including making such stops with weapons drawn when those actions are reasonably necessary for the protection of the officers." Id.

10

The officers' conduct at the KSU Airport certainly went beyond a "ramp check." The officers stopped Airplane N668LB by blocking it with six to eight police cruisers with their sirens on.  The officers then pointed their weapons at the plane and shouted for the Defendants to exit the plane. The Defendants were then handcuffed and each placed in a cruiser for questioning while the officers conducted a dog sniff.  After a positive sniff, the officers conducted a full search of the plane.

The officers at the KSU Airport, however, acted reasonably given the totality of the circumstances.  The officers perceived a heightened risk when they encountered Defendant Hawes in the parking lot waiting to meet the plane, and when they heard the plane "rev back up."  In the interest of safety, the officers conducted an assertive, "high risk stop" to prevent any possible confrontation.  The officers refrained from using any undue force or delay, but took reasonable actions to protect themselves and the Defendants.  At no time, therefore, did the investigatory stop of Airplane N668LB mature into an illegal arrest.

**C. The officers' use of a dog sniff was lawful.**

Finally, the Court must determine whether the officer's use of a narcotics detection canine was lawful.  Defendants contend that the dog sniff unreasonably prolonged the officers' investigatory stop and thus violated the violated the Fourth Amendment.

A dog sniff conducted during a lawful detention generally does not violate the Fourth Amendment.  United States v. Place, 462 U.S. 696, 707 (1983); United States v.

Perez, 440 F.3d 363, 375 (6th Cir. 2006). In fact, the use of a dog sniff is considered a minimally intrusive means of investigating whether an officer's suspicions are valid and does not encroach upon a reasonable expectation of privacy. Place, 696 U.S. at 707 (2005).

When a trained narcotics canine "alerts" to an item, probable cause is established for a search. United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998); United States v. Diaz, 25 F.3d 392, 393-94 (6th Cir. 1994). Nevertheless, a dog sniff may not prolong a Terry stop beyond the time reasonably required to complete the purpose of the stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005).

In the instant case, the canine unit arrived on the scene simultaneously with the other officers. Video introduced at the hearing showed that the dog was employed immediately after the Defendants were ordered out of the plane. Within minutes, the dog gave a positive signal. There was therefore no unreasonable delay of the Defendants' detention. Use of the drug dog was in fact a reasonable way to quickly determine if there was contraband on Defendants' plane.

At the Suppression Hearing, the Government elicited testimony that the officer and canine were appropriately trained and certified. (Tr. at 116-117). They have worked together as a team since 2001. (Tr. at 116). Once the properly trained dog gave a positive sniff, the officers had probable cause to search the plane. The Court therefore finds that the detention of the Defendants and the dog sniff were both reasonable and lawful.

**IV. CONCLUSION**

For the foregoing reasons, the Court hereby **DENIES** Defendant Malcolm A. Sales' July 15, 2008 Motion to Suppress Evidence and **DENIES** Defendant Tommy A. Gonzales' July 21, 2008 Motion to Suppress Evidence.  (Dkt. # 14, 18).

**IT IS SO ORDERED.**

<u>**s/ Peter C. Economus - August 21, 2008**</u>
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**